Duffy *v.* The Monongahela Connecting Railroad Company, Appellant.

362

Argued March 27, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*J. N. Poffinberger, Jr.*, with him *Kirkpatrick, Pomeroy, Lockhart & Johnson*, for appellant.

*James P. McArdle*, for appellee.

OPINION BY MR. JUSTICE BELL, June 24, 1952:

Plaintiff brought an action in trespass for personal injuries under the Federal Employers' Liability Act, Act of April 22, 1908, c. 149; 35 Stat. 65; 45 U.S.C.A. 51, as amended.

Plaintiff, 54 years of age, was employed as a conductor by the defendant, a carrier in interstate commerce. While he was engaged in his work he fell from the ladder of a railroad car to the ground—a distance of five feet. As a result of the fall he sustained a sprain of his lower back and abrasions and contusions of his right thigh. His thigh was completely healed in ten days. The jury returned a verdict for plaintiff in the amount of $20,000.00, which was reduced by the trial Court to $14,000.00. Defendant, conceding its negligence, appeals solely on the ground that the verdict as reduced by the Court below is still excessive.

The rule applicable to the question here involved is thus stated in *Brown v. Paxton*, 332 Pa. 260, 264, 2 A. 2d 729: ". . . A judgment will be reversed or modified on appeal because of an exorbitant verdict only where it is so excessive as to shock our sense of justice, and the impropriety of permitting it to stand is so manifest as to show an abuse of discretion on the part of the court below in refusing to set it aside: Scott v. American Exp. Co., 257 Pa. 25; Gail v. Phila., 273 Pa. 275; Goldman v. Mitchell-Fletcher Co., 285 Pa. 116; King v. Equitable Gas Co., 307 Pa. 287."

In order to determine whether this verdict is greatly excessive, it is necessary to examine the nature and the extent of the injuries suffered by the plaintiff, the wages he lost as well as the wages he will likely lose by reason of loss of earning power, his reasonably necessary expenses, and his pain and suffering—provided, of course, that these resulted from his fall: *Kmiotek v. Anast*, 350 Pa. 593, 39 A. 2d 923.

Plaintiff fell from the defendant's car on November 27, 1948. He was taken to the hospital and then returned to his home. He was then X-rayed and thereafter saw the doctors a number of times for observation, advice or treatment. The only treatment which the doctors prescribed was hot applications and massage to his back. As a result of his injury he was absent from work until January 10, 1949, a period of 45 days. He testified that thereafter there were days when he would be unable to work. He had no medical expenses. The parties have stipulated that the earnings lost by the plaintiff as a result of his injuries amounted to $1,-000.00. Two of the three doctors testified that there was still tenderness and some slight muscle spasm in the lower back, and that plaintiff had objective evidence of a sprain of this area. The evidence was conflicting as to whether this back condition was permanent, and

whether it came from arthritis or partly from arthritis and partly from the injury. There was no evidence whether the arthritic condition was present before his injury.

Plaintiff has full range of motion of his arms and legs but complains of pain upon full flexion and extension. With reference to his sprained back, plaintiff's own testimony is illuminating. When he was having his thigh bandaged several days after the accident, he complained to the doctor about his back: "I thought it was bothering me, which it was at the time, and I complained to him about it and he examined it and he says he didn't think there was anything wrong. . . . He told me to put hot applications on it and rub it." Plaintiff testified that his back still gives him pain at times, especially when bending or lifting, and quite often the thigh gets sort of numb. Plaintiff also testified that he was not able to perform his work as readily as before the accident, and that he can't throw a switch like he used to, or help his wife around the home as he did before his injury. A witness for the defendant testified that plaintiff was always a slow worker and that he couldn't notice any difference in the way he worked after than the way he worked before the accident. There was no evidence that plaintiff's earning power had been impaired as a result of the accident.

Weighing carefully all the evidence pro and con, and giving what we believe is a fair and perhaps generous amount for pain and suffering, the verdict in favor of the plaintiff is reduced to $8,000.00; and the judgment as thus modified is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

In this suit brought under the Federal Employers' Liability Act for damages for personal injury, the

appellant-defendant here concedes liability and questions only the quantum of the judgment entered on the verdict for the plaintiff as substantially reduced by the court below. My reading of the evidence suggests no basis for a further reduction by this court. The proper amount of the verdict had the careful consideration of the court en banc which included the learned trial judge who had the opportunity of seeing and hearing the plaintiff on the stand as well as the witnesses, both lay and medical, as to the effect of the injury upon the plaintiff presently and prospectively. I would therefore affirm the judgment as entered below.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In my opinion, the decision of this Court to reduce the verdict from $14,000 to $8,000, since it was already once reduced by the lower court, is in the nature of an invasion of the rights of the tribunal charged with the responsibility of ascertaining the facts.

A jury of twelve persons had untrammeled opportunity to see and study the plaintiff for two days, they saw and heard the witnesses who testified with regard to his physical condition and then, after determining the legal liability, they returned a verdict for the plaintiff in the sum of $20,000. The learned and able trial judge, who also saw and heard the plaintiff, reduced the verdict, with the advice and counsel of two other judges, to $14,000.

Now, this Court, solely from the cold, printed page, unwrinkled by the corrugations of pain that the jury and the trial judge saw on the face of the victim of the accident which caused this law suit, has decided to lop off $6,000 more. By what authority is this done?

Running through reports of the Supreme Court, like an impatient refrain in a symphony, appears over and over the statement that "the matter of an excessive

verdict will be reviewed only where the excess is such as to shock one's sense of justice and manifests plainly an abuse of discretion on the part of the court below."

What is there in a verdict of $14,000, in view of the plaintiff's injuries, which we will discuss later, which shocks our sense of justice? While the amount of $14,000 is a substantial one, it must be regarded in the light of conditions of today and not of yesteryear. One must consider today the purchasing power of any given sum rather than its figural magnitude. Living costs in 1952, as compared to those of five years ago, or even two or three years ago, are the glasses through which one must appraise the amount of damages which will fairly and reasonably compensate one who has been injured because of the fault of another.

Justice MINTURN of the New Jersey Supreme Court, in the case of *Bowes v. Public Service Railway Co.*, 94 N.J.L. 378, 110 A. 699, 700, decided as long ago as 1920, spoke well when he said: "The word 'excessive' has a relative meaning. What may be deemed excessive in one environment and social order may be inadequate compensation in another. At a period when the purchasing power of the dollar has in the language of the day been 'cut in half,' the value of the sum awarded here is not to be estimated in the numerical quantum of the recompense, but in its comparative ability to furnish the necessities of life. Of these facts the court must take judicial notice."

In *Clark v. Horowitz*, 293 Pa. 441, 444, this Court said: "It is the duty of the lower court to control the amount of the verdict; it is in possession of all the facts as well as the atmosphere of the case, which will enable it to do more even-handed justice between the parties than can an appellate court." Other decisions have affirmed this expression, and I regard with some concern the departure here from that salutary rule.

What were the damages sustained by the plaintiff in this case? The majority opinion states that the plaintiff "had no medical expenses." This is due not to slightness of the injuries sustained but to the fact that the plaintiff, as a railroad employe, was entitled to medical care from the railroad company's physicians without expense to him. Plaintiff and defendant counsel stipulated that the plaintiff's lost wages amounted to $1,000. On the day of the accident the plaintiff was removed to the hospital for emergency treatment and then returned to his home. For the following fifty days he was taken back and forth between his home and the dressing station for treatment and observation. During this period he had X-rays taken at the South Side Hospital, and he was also treated by his family physician, Dr. Schrack. Dr. C. C. Yount related the plaintiff's account of his injuries as follows: "Patient complained of discomfort in the lumbar area, the low lumbar area, that's down near the fifth lumbar, between the fifth lumbar and the sacrum. He had difficulty in turning over in bed or in any torsion movements. Complained of some numbness in the right lower extremity, posterior surface, that is the back surface, to just below the knee but did not go to the foot or ankle. The discomfort was most marked on stooping and getting up and down off the car, railroad car, which he said was necessary for him to do in his daily work. He also complained of discomfort on bending forward and lifting anything from a stooping position."

The plaintiff's family physician who prescribed for him during the acute phases of his disability, died since the accident and therefore did not appear at the trial. Dr. Francis J. Shiring, staff surgeon of the Presbyterian, Women's and Pittsburgh Hospitals, who examined the plaintiff in January, 1949, and in September, 1951, testified that he found objective symptoms

of disability evidenced by muscle spasm in the lower back region, that he attributed this condition to the accident, and that his condition would be permanent: "I don't think that any type of treatment is going to alleviate this man's symptoms this length of time after the accident."

Dr. C. C. Yount, chief of the Orthopedic Staff at the St. Francis Hospital, as well as assistant professor at the University of Pittsburgh, who was called by the defendant to testify, also found a "sprain of the lumbar area, more particularly in the lumbosacral segments," and he attributed this to the accident. He testified further that in his opinion treatment would not help the plaintiff much.

Dr. S. A. Norris, also called by the defendant, testified that he found an arthritic condition in the plaintiff's back, and on cross examination stated that it would be a natural assumption that "if a man worked without pain until he fell five feet striking his lower back against a rail and then from that time on suffered pain, it would be logical for a doctor, as well as a layman, to conclude that the blow of that area of the back would be the cause of the subsequently seen arthritic condition."

Although the plaintiff has returned to his employment, his back condition has considerably interfered with the proper discharge of his duties: "I can't do the things that I used to do. It gives me pain. And at work I can't throw a switch like I used to. I got to bend my knees all the way down and pick the switch up, which is only a couple inches off the ground. Getting on and off cars sometimes I can't even do it."

The pain the plaintiff suffers at times is of such severity that he is unable to report for work: "Q. When does this back pain you particularly? A. Well, it gives me a lot of trouble at work and in the mornings. Well,

through the night sometimes, most of the time, but in the mornings I get up out of bed, generally get up at 5:15 for work and 5:30 I have to call up and report off because I couldn't make it."

The deterioration in the plaintiff's efficiency and the pain which accompanies the discharge of his duties, was described by one of his fellow-workmen: "A. Well, previous to his accident he was very lively; he could get around, and now he has an awful time getting up and down off the cars and when he tries to throw a switch he is in an awful strain; he is unable to bend, that is correct, he stoops straight down, he don't go bending his back, he can't bend his back. Q. Tell us about swinging on and off the trains when they are moving. Is that the normal way you brakemen do? A. The normal way, you are moving, in a moving position, you just swing right up on the car. Mr. Duffy himself can't do that. He has to stop it most of the time to let him on. Q. Have you ever seen him trying to and not been able to? A. Recently we passed him up quite a number of times. We had to stop and wait for him. He is the conductor. We got to wait for him to give us orders. Q. You mean he wouldn't be able to get on the car? A. He wouldn't be able to get on when we were going by him. Q. And you would stop until he could go on? A. Stop until he caught up to us."

In awarding damages for pain, suffering and inconvenience in a case of this kind, it is also to be considered that a back injury to a railroad worker, who must move about in the turbulent arena of shifting locomotives, drifting cars and falling missiles from overloaded gondolas, increases the hazards of his work immeasurably. The perils of a railroad track are legendary and the difference between safety and serious injury or death is often the matter of a split second's physical movement.

Francis J. Lee, a conductor in the same yard in which the plaintiff is employed, testified that he knew Thomas J. Duffy as a "spry fellow" prior to the accident, but that now "he is not as active as he used to be . . . He don't do his work like he should. He don't help his brakeman. He is slow."

Testimony at the trial indicated that the plaintiff's back injury has considerably decreased his ability to attend to domestic duties at home. A man's services around the house have been so much a subject for light humor and cartoon that the seriousness and efficacy of his domestic toil does not always receive the acknowledgment it deserves. The difference between a bare abode and a comfortable home depends to a great extent on the householder's skill with hammer, saw, hoe, mower, rake and paint brush. And if a man is so injured that he cannot perform his physical domiciliary duties he has been deprived of something which is as definitely a loss as a paring down of earnings. Mrs. Duffy, the plaintiff's wife, testified that prior to the accident her husband did the heavy work around the house, such as painting, washing walls, repairing, mowing and washing windows, but that his disability now impedes him in this endeavor and she cannot do the work because of an operation she has undergone. This inability to attend to the physical demands of his dwelling is definitely an item to be included within the parentheses of pain, suffering and inconvenience to which Mr. Duffy has been subjected because of the accident.

I would affirm the judgment of the court below in the sum of $14,000. The medical testimony, coupled with the testimony of the injured person himself, his family, and his fellow-workers, as to the difficulties of movement he encounters in performing his ordinary tasks, and the discomfort, pain, annoyance and inconvenience he has suffered and will yet suffer, is more than

sufficient to sustain the verdict as reduced. Thomas J. Duffy should not be penalized because he has braved a return to his labors even though he accomplishes them with pain and at an increased peril to his life.