Florig *v.* Sears, Roebuck & Co., Appellant.

Argued January 9, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Morris Wolf*, with him *Maxwell Strawbridge, Bernard M. Borish,* and *Wolf, Block, Schorr & Solis-Cohen,* for appellant.

*Wm. J. Moran, Jr.,* with him *Harry N. Moran, Jr., Wm. J. Moran, III,* and *Hillegas & Moran,* for appellee.

OPINION BY MR. JUSTICE BELL, March 25, 1957:

Plaintiff brought an action in trespass for personal injuries resulting from two widely separated accidents. The serious injuries which he suffered on June 14, 1952, he alleged, resulted from an accident on March 17, 1951. Plaintiff, on March 17, 1951, entered one of the defendant's warehouses in order to purchase some siding. Plaintiff tried to pass around the supervisor of defendant's warehouse, and, because of the inadequacy of light, stepped into a hole in the floor of the warehouse and fell, thereby *injuring his left hand and wrist.* Although he claims that he suffered constant pain, he lost no time from work and made no claim for any injuries resulting from this accident until January 23, 1953, *over 22 months later.*

On June 14, 1952—15 months after the first accident—while painting the roof of a neighbor's house, plaintiff's left wrist and hand suddenly gave way and he fell to a concrete floor on the ground level, breaking his right heel and suffering contusions. His leg was in a cast for six weeks. The accident occurred, according to plaintiff, as follows: "I started at nine o'clock in the morning, and by three o'clock in the afternoon I only had about two more square yards to do. To do that roof, I had to move the ladder about five or six times. And to do those two square yards, I had to make one more move. I put the ladder in position, got my stain, and went up and finished the two square

yards, tried to. I put my left hand against the roof, worked with the right hand, and before I know, *my left hand just gave way*,* collapsed. I fell back to my elbow, and I thought I could stop it from going any further, but I didn't succeed, and I kept on rolling towards the left.

"I did grab for the ladder with my right hand, and got hold of the ladder, and lifted the ladder from the roof. And through all that commotion, the ladder gave way on the bottom, and out she went, and the ladder and all fell down."

It was not until seven months after this second accident and twenty-two months after the first accident, that the plaintiff sued the defendant for damages for the injuries which he allegedly sustained in both accidents. Plaintiff contends that the first accident was attributable to the defendant's negligence and that the second accident resulted from the injury to his wrist which he sustained in the first accident.

Defendant denied that it was responsible for the first or second accident and further denied that the first accident caused the second accident or the injuries received therein. During the course of the trial considerable medical testimony was presented by both litigants and it is this testimony which raises the crucial point in this appeal.

The jury returned a verdict for plaintiff in the amount of $11,000., based almost entirely upon the injuries he suffered in the second accident. Defendant's motions for judgment n.o.v. and for a new trial were denied by the lower Court.

Defendant is pressing, in this appeal, its motion for a new trial. Defendant contends (1) that legally competent medical testimony was required to establish a

* Italics throughout, ours.

*causal connection* between the two accidents and (2) that such testimony was not produced by plaintiff and (3) consequently it is not liable for injuries suffered by plaintiff in the second accident and therefore a new trial should be granted. A review of the medical testimony and the pertinent authorities substantiate defendant's position.

If plaintiff wished to recover for injuries resulting from the second accident it was incumbent on him—under the facts of this case—to prove by competent and definite medical testimony that there was a causal relationship between the two accidents. Courts have found it difficult to lay down a precise standard which can fit every case on the question of whether medical testimony is necessary to prove a causal connection between the latest injury and a prior injury. The necessity of medical testimony will depend in each case upon the particular facts of that case including, inter alia, the kind of injury which occurred in each accident, the time interval between the accidents, the plaintiff's activities between the accidents, and the exact manner in which the last accident occurred.

In *Washko v. Ruckno, Inc.*, 180 Pa. Superior Ct. 606, 121 A. 2d 456, medical evidence was required to prove that a heart attack was produced by heavy work done thirty minutes before. The Court said (page 609) : "It was claimant's duty to prove that her husband's death resulted from the alleged over-exertion: Adamchick v. Wyoming Valley Colleries Co., 332 Pa. 401. *Where there is no obvious causal relationship,** unequivocal medical testimony is necessary to estab-

---

* Cf. *Gill v. Wentz*, 365 Pa. 32, 73 A. 2d 403; *Saylor v. Greenville Steel Car Co.*, 157 Pa. Superior Ct. 331, 43 A. 2d 633; *McCoy v. Spriggs*, 102 Pa. Superior Ct. 500, 157 A. 523; *Stracka v. Mosko*, 99 Pa. Superior Ct. 463; *Utzman v. Penna. Rubber Co.*, 96 Pa. Superior Ct. 463.

lish the causal connection: Rich v. Philadelphia Abbatoir Co., 160 Pa. Superior Ct. 200."

In *Fink v. Sheldon Axle & Spring Co.*, 270 Pa. 476, 113 A. 666, medical testimony was required to connect a paralytic stroke with being struck by a swinging door. Similarly, medical testimony was held necessary where plaintiff contended that pneumonia resulted from a cut in his arm two months previously: *Anderson v. Baxter*, 285 Pa. 443, 132 A. 358. Medical testimony was likewise held to be necessary where a plaintiff claimed that pneumonia was the result of an accident he had suffered seven weeks earlier: *McCrosson v. P. R. T. Co.*, 283 Pa. 492, 129 A. 568.

On the other hand, medical testimony was held to be unnecessary in *Tabuteau v. London G. & H. Co. Ltd.*, 351 Pa. 183, 40 A. 2d 396, where plaintiff suffered pain in his groin and a hernia developed immediately after he misstepped on an uneven sidewalk. The Court said (page 186) : ". . . expert testimony is not necessary where death (or injury) is so *immediately and directly, or naturally and probably,* the result of the accident that the connection between them does not depend solely on the testimony of professional or expert witnesses: Davis v. Davis, 80 Pa. Superior Ct. 343; McCoy v. Spriggs, 102 Pa. Superior Ct. 500, 157 A. 523.

"Plaintiff produced direct and competent evidence which, if believed, clearly established the causal relationship between the accident and the injuries. Plaintiff's own testimony is sufficient to support the finding of the jury that he suffered an accidental injury within the terms of the policy, resulting in disability.

"In Mohr v. Desimone & Sayers, 110 Pa. Superior Ct. 44, 49, 167 A. 504, the court said: 'It has frequently been held that where the disability complained of is *the natural and probable result of the injuries,* the fact-finding body may be permitted to so find, even in the

entire absence of expert opinion.' In the instant case
the sequence of events strongly indicates a causal con-
nection between the entirely unexpected injury and the
continuous disability following it. Plaintiff had been
in excellent health, and had done the same work for
thirty years before the accident. But immediately
after the accident he was disabled by a perfectly ob-
vious injury *which a layman could diagnose,* and he
was unable to work as before. *The accident and the
injury were so closely connected, and so quickly ap-
parent, that the circumstances themselves justified the
submission to the jury*: Stracka v. Mosko, 99 Pa. Su-
perior Ct. 463.''

In the instant case, the evidence including the in-
terval of time between accidents and the manner in
which the last accident occurred make it obvious that
only expert testimony could connect the two accidents.
The second accident could have happened from any
one of half a dozen different causes. There was no ob-
vious causal relationship between the accident of March
17, 1951 and the accident of June 14, 1952. The last
accident could not reasonably be said by a layman—
without guessing—to be the natural and probable re-
sult of the injuries suffered from the first accident.
The second accident did not immediately and directly
result from the first accident nor was it the natural
and probable result of the first accident which was so
closely connected and so readily apparent that a lay-
man could diagnose (except by guessing) the causal
connection. In other words, medical testimony was
necessary to establish—if it could—the causal connec-
tion between the two accidents.

Plaintiff, in order to prove the causal connection
between the two accidents, called Dr. Herbert Kaplan,
his family physician, and Dr. London. Dr. Kaplan
treated the plaintiff after both accidents, but did not

know, before the present trial, that plaintiff had previously (many years before) broken his left wrist. His pertinent testimony was as follows: "I feel that it is *possible and very highly probable* that because of the burning sensation and the pain which flew in there, and, understand, I told the man to use his hand, that it is *possible* he had the same type of burning, tingling, boring pain—. . . . In my opinion, the cause of the collapse of the wrist on that day was due to the causalgia-like pain which had been persisting since the day of the [first] injury. If I can simplify it, I will say in my opinion that this *could* have caused him to slide from the roof."

Dr. Russell London, the second doctor produced on behalf of the plaintiff, testified relative to the question of causation: "A. In a wrist previously fractured but permitting, according to history, full function over all those years, and then paining consistently from the time of the second episode, with the degenerative changes we have previously mentioned in that wrist, *I can conceive* that there is pain at the extremes of certain motion, and for an excessive length of time, which *could have caused* the patient to save his hand suddenly and lost his balance."

Plaintiff's medical history revealed that before the first accident he had broken his left wrist and sustained an injury to the radial joint of his left arm and had developed both degenerative arthritic changes and severe hypertension, which of itself may well cause dizziness. Furthermore, he had been painting this roof for six hours; he had moved the heavy ladder about five or six times during that day; and had just moved the ladder immediately before the accident. These important facts were not mentioned by Dr. Kaplan or by Dr. London.

Dr. Ellwood S. Myers, who examined plaintiff at defendant's request, testified, in response to the question of whether the second accident was suffered as a result of the first accident: "A. I would say definitely no. My reason for that is three-fold, if I may explain that. Most unfortunately, this man has, as I have told you, two previous injuries to this wrist. From examination of the X-rays, he could not have, previous to this, a perfectly normally functioning wrist. That goes without doubt because of the presence of arthritic change in the radial head. That would have prevented him, no matter what he says or what anyone says, just by looking at the X-rays, it would have prevented him from bringing that hand perfectly inside normally and give him full function. It could not have helped to. It would also prevent his putting it all the way out, and to a certain extent it would have prevented him getting it up. It may not have hurt him, I won't argue that. But here is an injury that preceded, and here is another injury that preceded, and on top of that he gets a third injury. He couldn't help but have a weak arm, I don't see how he could help it. But to blame that on an injury that didn't even injure the bone, and injured the soft tissues, giving him, if you want to term it, a neuralgia or a neuritis, I am afraid I can't see it.

"As far as his falling off the roof is concerned, I don't know anything about this, but upon my physical examination, the man has a terrific hypertension. He has 204 blood pressure, systolic, over eight-six. He has very poor eyesight. His eyes, normal eyesight, should be twenty-twenty. His vision is twenty over a hundred. Those two factors, in themselves, certainly must have a bearing. Q. Does hypertension sometimes cause dizziness? A. Yes, it definitely does."

The law in this field is well settled.  In *Wargo v. Pittsburgh Railways Co.*, 376 Pa. 168, 101 A. 2d 638, this Court reversed the lower Court and granted a new trial in a case analogous to the one at bar.  The Court said: "From the testimony of plaintiff's physicians it is impossible to do anything but guess as to how much, if any, of plaintiff's present back condition is due to the present accident instead of to his original back injury and arthritis!"

In *Menarde v. Philadelphia Trans. Co.*, 376 Pa. 497, 103 A. 2d 681, the Court said (page 501): "Moreover the expert has to testify, not that the condition of claimant *might have, or even probably did,** come from the accident, but that in his professional opinion the result in question came from the cause alleged.  *A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence*: Vorbnoff v. Mesta Machine Co. et al., 286 Pa. 199, 206, 133 A. 256; Powell v. Risser, 375 Pa. 60, 68, 69, 99 A. 2d 454; Wargo v. Pittsburgh Railways Company, 376 Pa. 168, 172, 101 A. 2d 638."  See to the same effect: *Nestor v. George*, 354 Pa. 19, 46 A. 2d 469; *Anderson v. Baxter*, 285 Pa. 443, 132 A. 358; *McCrosson v. Philadelphia Rapid Transit Co.*, 283 Pa. 492, 129 A. 568; *Fink v. Sheldon Axle & Spring Co.*, 270 Pa. 476, 113 A. 666; *Monahan v. Seeds & Durham*, 336 Pa. 67, 6 A. 2d 889.

The case at bar is ruled, both on its facts and in principle, by the above mentioned authorities.  Dr. Myers positively and unequivocally denied that the injuries suffered in the second accident resulted from the injuries incurred in the first accident.  Dr. London, plaintiff's witness, testified that the injuries received in the first accident "could have" caused the second

---

* Italics throughout, ours.

accident. Dr. Kaplan's opinion was qualified by his testimony that the first accident "could have caused" or that "it is possible and very highly probable" that it caused the second accident; he also testified "in my opinion this *could* have caused him to slide from the roof." None of plaintiff's medical testimony was sufficient to meet the standard of proof required by the cases hereinabove cited.

In *Nikisher v. Benninger*, 377 Pa. 564, 105 A. 2d 281 and *Bender v. Welsh*, 344 Pa. 392, 25 A. 2d 182, which are relied upon by the lower Court, medical testimony was not required to establish the causal relationship between the two accidents and the cases are on their facts clearly distinguishable.

It is unnecessary to discuss whether a new trial should be granted because the verdict was against the evidence or against the weight of the evidence. Cf. *Wargo v. Pittsburgh Railways Co.*, 376 Pa., supra; *Duffy v. The Monongahela Connecting R. R. Co.*, 371 Pa. 361, 89 A. 2d 804; *Dupont v. Gallagher*, 360 Pa. 419, 62 A. 2d 28; *King v. Equitable Gas Co.*, 307 Pa. 287, 161 A. 65; *Smith v. Allegheny County*, 377 Pa. 365, 105 A. 2d 137.

The judgment of the lower Court is reversed and a new trial is granted.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On March 7, 1951, while visiting a warehouse belonging to Sears, Rosbuck & Co., in Norristown, Emil J. Florig, the plaintiff in this case, fell and sustained injuries to his left hand and wrist and back. His physician, Dr. Herbert Kaplan, informed him, after treating the hand for some time, that the repairing process was a slow one and he advised Florig to use

the affected hand, lest it waste and atrophy. In obedience to this direction, Florig resumed his work as a painter.

On June 14, 1952, while he was painting a roof, the ailing hand gave way (the plaintiff described it as a "collapse"), and, being unable to prevent his sliding and rolling down the slope on which he was working, he dropped to the cement floor beneath, damaging his right heel to such an extent that he has now practically lost the use of his foot. He sued Sears, Roebuck & Co., claiming that his second accident was the result of his debilitated hand which had been injured through the negligence of the defendant at the time of the first accident. The jury returned a verdict of $11,000 in his favor. The defendant moved for a new trial, contending that there was no causal connection between the first and second accidents. The lower Court refused the new trial, and this Court is reversing the lower Court.

Of course, if the second mishap was in no way a sequel to the first one, the defendant is entitled to a new trial for it would be impossible for this Court or any Court to determine how much the jury allowed the plaintiff for each misfortune.

This appeal really presents only one question, namely, was the second fall so inevitably a consequence of the first fall that the event of March 7, 1951 can be considered the *cause* and the event of June 14, 1952, the *effect*? This is a medical-factual question, not an appellate judicial one, and we are outside our field in trying to apply a juridical stethoscope to the heart of the problem.

Dr. Kaplan, the plaintiff's physician, testified: "In my opinion *the cause* of the collapse of the wrist on that day *was due to the causalgia-like pain which had been persisting since the day of the injury.* If I can

simplify it, I will say, in my opinion, that this could have caused him to slide from the roof."*

The Majority Opinion sees some fault in the doctor's use of the phrase "could have caused him", but it overlooks the more essential and crucial part of the Doctor's answer, namely, "the cause of the collapse of the wrist on that day was due to the causalgia-like pain which had been persisting since the day of the injury (the injury of March 7, 1951]." The doctor expressed no doubt about the collapse of the wrist and what caused it, namely, the first accident, and then added that this condition "could have caused" him to slide from the roof. Here he was simply being candid. He would have had to be dishonest or he would have had to be an infallible retrospective Cassandra to say positively: "I know of my personal knowledge that the collapse of Florig's wrist brought about the injury to his foot."

How would the doctor, or anyone not actually on the roof with the plaintiff, know the mechanics of the plunge from the top of the house to the ground? How could the doctor testify to what was beyond the ken of his knowledge? He did state categorically that the wrist collapsed because of the pain and weakness resulting from the first accident. It was up to the jury to decide whether a workingman 55 years of age on a slanting roof could arrest a precipitate descent when all power drained from one of his wrists, and his entire left arm thus became an impediment instead of a staff of resistance to the forces of gravitation.

There must be added to this picture the fact that the plaintiff himself *positively* testified that it was the failure of his left wrist which caused the disastrous drop. After hearing all this testimony the jury did

* Italics mine.

find a causal connection between the first accident and the second.

If a hospital patient, suffering from an injured foot due to a tortious accident, slips and falls, because of the weakness of that foot, and breaks a leg, the person responsible for the injured foot will be liable for the broken leg as much as if he had struck at the leg during the commission of the original tort. Nor would the situation change if the patient had left the hospital and broken his leg subsequently, so long as that subsequent break was due to the weakness of the foot. Thus, the only inquiry before us is whether there was sufficient evidence upon which the jury could base its conclusion that Florig fell from the rooftop because of his inability to hold on to his precarious perch as a result of the weakness of his left wrist, for which the defendant was admittedly responsible. I agree with the lower Court that there was such evidence. It is to be noted that not even the defendant's doctor ventured to say that the plaintiff's second accident was not caused by the defection of the plaintiff's exploded and helpless wrist.

The lower Court, in disposing of the defendant's motion for judgment n.o.v., properly and rationalistically said: "The jury may have inferred that the second fall resulted from the original injury. If so, such inference was supported by the testimony of two medical experts and also by the testimony of the plaintiff himself. There being a total absence of any evidence which pointed to any other cause of the second fall, we are of the opinion that the plaintiff's evidence furnished a rational basis for a verdict including damages resulting from the second accident."

I agree with this statement. Judge FORREST, who wrote the Opinion in the lower Court, cited as authority in behalf of the Court's position the case of *Bender*

*v. Welsh*, 344 Pa. 392, 398. I believe that what we said in that case is still good law, namely: "Evidence of subsequent injury is admissible to affect the measure of damages on the original injury only if the subsequent injury was proximately caused by the original negligence. Defendants contend that Mrs. Bender slipped from an independent cause and that therefore the original accident was in no way responsible, citing Wineberg v. DuBois Boro., 209 Pa. 430. In that case plaintiff's second fall 'was not caused by the injured leg, but by the slipping of the sound foot'. *In the instant case plaintiff's subsequent fall was attributable to the failure of the injured limb to function properly, and this was the result of the original injury.* The evidence was therefore properly admitted: Marshall v. Pittsburgh, 119 Pa. Superior Ct. 189, 197-8; Gallagher v. Hudson Coal Co., 117 Pa. Superior Ct. 480, 483."