**In re Karl Heinz DOBROWSKY, Individually and t/a Alster Tool Co., and jointly with Ruth Gerda Dobrowsky, Debtors.**

**Karl Heinz DOBROWSKY, Plaintiff,**

v.

**The HANOVER INSURANCE CO., Defendant.**

**Bankruptcy No. 81–04732G.**
**Adversary No. 82–0259G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 20, 1982.

Jerrold V. Moss, Robert Szwajkos, Rubin, Quinn, Moss & Girard-deCarlo, Philadelphia, Pa., for plaintiff/debtor, Karl Heinz Dobrowsky.

Charles A. Harad, Judith A. Love, Philadelphia, Pa., for defendant, Hanover Ins. Co.

**320**

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The action before us, unique in a bankruptcy case, arises out of a claim for damages allegedly suffered by the husband-debtor ("the debtor") as a result of an automobile accident. When his insurance company terminated the benefits he was receiving, the debtor commenced an adversary proceeding in this court against the company.

The issues before us are: (1) whether the debtor's alleged post-concussion syndrome and the symptoms related thereto are causally related to an accident so as to warrant coverage under the debtor's insurance policy; (2) whether the insurance company overpaid work loss benefits to the debtor between April 5, 1981, and May 19, 1981; (3) whether the debtor was entitled to any work loss benefits after May 19, 1981; and (4) whether the debtor's claim for no-fault benefits was so excessive and fraudulent as to justify the awarding of attorney's fees to the insurance company. We conclude that the debtor has not proven by unequivocal medical testimony that the alleged post-concussion syndrome was causally connected to the accident in question or that the physical therapy received after August 24, 1981, was for a condition caused by the accident. We further conclude that the debtor was entitled to work loss benefits for the injuries originally diagnosed after the accident up until May 19, 1981, but that the insurance company overpaid the debtor during that period in the amount of $148.62. In addition, we find that the debtor was not disabled after May 19, 1981, and that, therefore, the debtor must return the $3,000.00 paid to him by the insurance company for work loss after May 19, 1981. Finally, we conclude that neither the insurance company nor the debtor are entitled to attorneys' fees.

The facts of the instant case are as follows:[1] On November 17, 1981, Karl Heinz Dobrowsky ("the debtor"), individually and t/a the Alster Tool Company, together with his wife, filed a petition for reorganization under chapter 11 of the Bankruptcy Code. Prior thereto, on March 23, 1981, the debtor was involved in an automobile accident wherein he suffered personal injuries. At the time of said accident, the debtor was insured under an automobile insurance policy issued by The Hanover Insurance Company ("Hanover"), the defendant herein. Hanover paid all of the debtor's medical expenses from March 23, 1981, until August 24, 1981, and furnished work loss benefits to the debtor from April 5, 1981, through August 21, 1981. However, on September 30, 1981, Hanover informed the debtor that it would no longer honor claims for no-fault benefits after August 19, 1981, because it had concluded that medical treatment was no longer necessary. Consequently, on February 5, 1982, the debtor filed the instant complaint to recover benefits under the provisions of the Pennsylvania No-Fault Motor Vehicle Insurance Act ("the No-Fault Act") alleging that: (1) he has had to continue medical treatment as a result of the March 23, 1981, accident and that, as a result of said treatment, he has incurred medical expenses in the amount of $5,252.00 for which Hanover is liable under the terms of the insurance policy and the No-Fault Act; and (2) he was unable to work, as a result of the aforesaid accident, through December 31, 1981, and that, therefore, he was entitled to work loss benefits from Hanover in the amount of $4,294.00.

■ It is well established under Pennsylvania law that when there is no obvious causal connection between the occurrence of the accident and the injury complained of, *unequivocal* medical testimony is necessary to establish the requisite causal relationship. The Superior Court of Pennsylvania has stated that:

> "Where there is no obvious causal relationship, unequivocal *medical* testimony is

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

necessary to establish the causal connection" . . . But where "the disability complained of is the natural and probable result of the injuries, the fact-finding body may be permitted to so find, even in the absence of expert opinion." . . . The two must be "so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection." . . . (citations omitted) (emphasis in original).

*McArdle v. Panzek,* 262 Pa.Super. 88, 92, 396 A.2d 658, 660 (1978) *citing Smith v. German,* 434 Pa. 47, 50–51, 253 A.2d 107, 109 (1969). *See also Florig v. Sears, Roebuck & Co.,* 388 Pa. 419, 130 A.2d 445 (1957); *Menarde v. Philadelphia Transp. Co.,* 376 Pa. 497, 103 A.2d 681 (1954); *Anderson v. Baxter,* 285 Pa. 443, 132 A. 358 (1926); *Albert v. Alter,* 252 Pa.Super. 203, 381 A.2d 459 (1977); *Heffer v. GAF Corp.,* 29 Pa.Cmwlth. 365, 370 A.2d 1254 (1977). In *Pagan v. Dewitt P. Henry Company,* 27 Pa.Cmwlth. 495, 365 A.2d 463 (1976), the court held that " 'the medical witness must testify, not that the injury or condition might have, or even possibly did, come from the assigned cause, but that in his professional opinion the result in question did come from the assigned cause.' " *Pagan, supra,* 27 Pa.Cmwlth. at 497, 365 A.2d at 464 *quoting Washko v. Ruckno, Inc.,* 180 Pa.Super. 606, 609, 121 A.2d 456, 457 (1956).

In the case *sub judice,* the debtor alleges that he developed a post-concussion syndrome six (6) months after the accident and that symptoms, including chronic fatigue, depression, loss of ambition, lack of sexual drive, clumsiness, loss of appetite and excessive sleep were all a result of the aforesaid syndrome. Hanover, on the other hand, contends that the abovementioned maladies of which the debtor complains are not, as required by Pennsylvania law under the present facts, unequivocally related to the automobile accident of March 23, 1981, and that, therefore, it was justified in cutting off the debtor's no-fault benefits on August 24, 1981. Nevertheless, the debtor continued to seek medical treatment after August 24, 1981, and incurred medical expenses of $5,252.00 which sum, the debtor maintains, is recoverable from Hanover under the no-fault provisions of the insurance policy.

Shortly after the accident in question, the debtor was diagnosed by his treating physicians as suffering from a cervical strain and sprain and a right inguinal hernia. As to the debtor's contention that he developed post-concussion syndrome as a result of the accident, we find it dispositive that the debtor's own treating physicians, Dr. Harvey Lisgar and Dr. Gilbert Kasirsky, never diagnosed the debtor as having post-concussion syndrome despite the fact that they saw the debtor approximately sixty-seven (67) times between the date of accident and August 24, 1982. Drs. Lisgar and Kasirsky submitted three (3) attending physician's reports to Hanover none of which indicated a diagnosis other than a cervical strain and sprain and a right inguinal hernia. The debtor acknowledges that no treating physician had, in the six (6) months immediately following the accident, diagnosed that the debtor was suffering from post-concussion syndrome.[2] Dr. Lisgar testified that neither he nor anyone connected with his office ever made a diagnosis that the debtor had post-concussion syndrome prior to August 24, 1981 (N.T. 5/10/82 at 203). Dr. Arnold Sadwin, who was called by the debtor, was the only doctor who testified that the debtor was suffering from post-concussion syndrome and this diagnosis was made six (6) months after the accident. To the contrary, Mr. Albert Levitt, a psychologist and Dr. Kenneth A. Kool, both of whom were called by Hanover, testified that a concussion or post-concussion syndrome usually clears up within the six months following the original injury rather than first manifesting itself six months after the accident (N.T. 5/11/82 at 46, 113). In addition, Dr. Leonard Klinghoffer testified that he would not expect the first symptoms or the first manifestations of a concussion to develop six months after the original injury (N.T. 5/11/82 at 158, 59). In any event, Dr. Sadwin testified

---

2. *See* plaintiff's proposed findings of fact, ¶ 11.

on cross-examination that the debtor's present maladies could be related to other factors such as the debtor's declining business (N.T. 5/10/82 at 69). After carefully reviewing the medical testimony, we cannot conclude, as we must under Pennsylvania law, that the debtor's present injuries were directly related to the accident in question. On the contrary, the record indicates that there are other equally possible causes of the debtor's current injuries, such as the debtor's failing business and the debtor's pre-existing degenerative arthritis. In short, the debtor has not met his burden of proving, by unequivocal medical evidence, that his alleged post-concussion syndrome and accompanying symptoms were caused by the March 23, 1981, accident, especially in light of the fact that there is, in the instant case as there was in *McArdle, supra,* a significant time lag between the accident the injury claimed.

As to the debtor's contention that physical therapy treatments were necessary after August 24, 1981, we note that Dr. Klinghoffer, who was also called by Hanover, testified that the physical therapy the debtor was receiving after August 24, 1981, from Drs. Lisgar and Kasirsky should have been discontinued because, in his opinion, no further physical benefit could have been expected from additional therapy given the fact that the debtor made approximately sixty-seven (67) visits to Drs. Lisgar and Kasirsky and received physical therapy on all or most of those visits (N.T. 5/11/82 at 153–56). Dr. Klinghoffer further testified that additional physical therapy at this point would be "like whipping a dead horse" (N.T. 5/11/82 at 160). Furthermore, the debtor admits that the physical therapy provided by Drs. Kasirsky and Lisgar after the time Hanover terminated the benefits, provide little, if any, benefit from an orthopedic standpoint.[3] Therefore, based on the debtor's own admission and the testimony

of Dr. Klinghoffer, we conclude that the aforesaid treatments provide the debtor with psychological, rather than physical, relief. This being so, we cannot conclude, based on the medical testimony presented, that the psychological benefit the debtor receives from continued physical therapy reflects treatment for an accident-related injury rather than treatment for the physical and psychological maladies caused by independent factors such as the debtor's pre-existing degenerative arthritis and the debtor's failing business. In other words, the debtor has not proven to our satisfaction that whatever restoration of "physical, psychological, social, and vocational functioning"[4] he receives from the continued physical therapy is restoration of physical, psychological, social, and vocational functioning lost as a result of the March 23, 1981, accident. Consequently, we will deny the debtor's claims for medical expenses.

Because we have concluded that the debtor's post-concussion syndrome and the symptoms related thereto are not accident-related and that there was no need for physical therapy after August 24, 1981, we need not consider the issue of whether the debtor had to submit the necessary bills for those injuries to Hanover.

Section 205 of the No-Fault Act provides for the calculation of work loss as follows:

(a) Regularly employed.—The work loss of a victim whose income prior to the injury was realized in regular increments shall be calculated by:

(1) determining his probable weekly income by dividing his probable annual income by fifty-two; and

(2) multiplying that quantity by the number of work weeks, or fraction thereof, the victim sustains loss of income during the accrual period.

\* \* \* \* \* \*

---

3. *Id.,* ¶ 16.

4. Section 103 of the No-Fault Act provides:
   "Medical and vocational rehabilitation services" means services necessary to reduce disability and to restore the physical, psychologi-cal, social, and vocational functioning of a victim. Such services may include, but are not limited to, medical care, diagnostic and evaluation procedures, physical and occupational therapy, other necessary therapies, . . . 40 P.S. 1009.103.

(d) Definitions.—As used in this section:

"Probable annual income" means, absent a showing that it is or would be some other amount, the following:

(A) twelve times the monthly gross income earned by the victim from work in the month preceding the month in which the accident resulting in injury occurs, or the average annual income earned by the victim from work during the years, not to exceed three, preceding the years in which the accident resulting in injury occurs, whichever is greater, for a victim regularly employed at the time of the accident;

(B) the average annual gross income earned by the victim from work during the years in which he was employed, not to exceed three, preceding the year to which the accident resulting in injury occurs, for a victim seasonally employed or not employed at the time of the accident; or

(C) the average annual gross income of a production or non-supervisory worker in the private nonfarm economy in the state in which the victim is domiciled for the year in which the accident resulting in injury occurs, for a victim who has not previously earned income from work.

"Work week" means the number of days an individual normally works in a seven-day period: "weekly income" means income earned during a work week.

40 P.S. § 1009.205.[5]

Pursuant to the aforesaid section, we conclude that the debtor's probable annual income should be calculated by averaging his gross annual income for the years 1978, 1979 and 1980, the three years preceding the year in which the accident occurred. 40 P.S. § 1009.205(a). Consequently, the debtor's probable annual income would be $15,676.66.[6] Dividing this amount by a factor of fifty-two (52), as required by section 205(a)(1) *supra,* the debtor's probable weekly income is $301.47. Eighty (80) percent of this probable weekly income is $241.17.[7] Therefore, Hanover's contention that it overpaid work loss benefits to the debtor on account of the debtor's submission of an incorrect tax return is well-founded because the calculation of the debtor's probable weekly income made above was calculated from the corrected tax return and the debtor's monthly income, based on that calculation, does exceed the maximum amount payable for work loss under the No-Fault Act. Section 202(b)(1)(A) provides:

\*　　\*　　\*　　\*　　\*　　\*

(b) Work loss limits.—Work loss, as defined in section 103 shall be provided:

(1) up to a monthly maximum of:

(A) one thousand dollars ($1,000) multiplied by a fraction whose numerator is the average per capita income in this Commonwealth and whose denominator is the average per capital income in the United States, according to the latest available United States Department of Commerce figures; or

\*　　\*　　\*　　\*　　\*　　\*

40 P.S. § 1009.202(b)(1)(A).

However, the Pennsylvania Insurance Commissioner has determined that the monthly maximum in section 202(b)(1)(A) above is $976.00. *See* Pennsylvania Bulletin, Vol.

---

5. Hanover's quotation of § 205(d)(A) in its trial memorandum is misleading in that it does not contain the second prong of the disjunctive standard set forth in § 205(d)(A).

6. 
| | | |
|---|---|---|
| 1980 | (net profit) | $ 6,071.00 |
| 1979 | (net profit) | $19,841.00 |
| 1978 | (net profit) | $21,118.00 |

7. Section 206(b) of the No-Fault Act provides:

\*　　\*　　\*　　\*　　\*　　\*

(b) Tax deduction.—If a benefit or advantage received to compensate for loss of income because of injury, whether from no-fault benefits or from any source of benefits or advantages subtracted under subsection (a) of this section, is not taxable income, the income tax saving that is attributable to such loss of income because of injury is subtracted in calculating net loss for work loss. Subtraction may not exceed twenty per cent (20%) of the loss of income and shall be in such lesser amount as the insurer reasonably determines is appropriate based on a lower value of the income tax advantage.

40 P.S. § 1009.206(b).

10, No. 43 (10/25/80). In any event, the debtor's probable monthly income, based on the corrected tax returns, does exceed the monthly maximum and therefore, Hanover was only obligated to pay the debtor the maximum of $225.23 per week.[8]

■ Hanover also contends that the work loss benefits paid to the debtor after May 19, 1981, were not warranted because the debtor was able to return to work after that date and that, therefore, the debtor should remit to Hanover all work loss benefits paid to him after May 19, 1981. We agree. The reports of the debtor's attending physicians all indicate that the debtor was able to return to work after May 19, 1981.[9] Nevertheless, Hanover continued work loss payments through August 21, 1981. The present record is devoid of any evidence indicating that the debtor was unable to work after May 19, 1981, especially in light of the fact that all of the aforesaid attending physicians' reports, the last of which was submitted on August 18, 1981, indicate that the debtor was not disabled after May 19, 1981. Consequently, we conclude that the debtor must remit to Hanover all work loss benefits received after May 19, 1981. We further conclude that although Hanover was obliged to pay the debtor $241.17 per week for work loss benefits until May 19, 1981, it should not have paid the debtor $250.00 per week and that, therefore, the debtor must remit to Hanover the amount overpaid for work loss benefits between April 5, 1981, and May 17, 1981, ($8.83 per week).

■ Finally, Hanover contends that it should be awarded attorney's fees in the instant matter under section 107 of the No-Fault Act which provides:

\* \* \* \* \* \*

(2) If, in any action by a claimant to recover no-fault benefits from an obligor, the court determines that the claim or any significant part thereof is fraudulent or so excessive as to have no reasonable foundation, the court may award the obli-

gor's attorney a reasonable fee based upon actual time expended. The court, in such case, may direct that the fee shall be paid by the claimant or that the fee may be treated in whole or in part as an offset against any benefits due or to become due to the claimant.

(3) If, any action by a claimant to recover no-fault benefits from an obligor, the court determines that the obligor has denied the claim or any significant part thereof without reasonable foundation, the court may award the claimant's attorney a reasonable fee based upon actual time expended.

40 P.S. § 1009.107.

We conclude that Hanover is not entitled to attorney's fees because we do not find the debtor's claim herein to be in any way "fraudulent or so excessive as to have no reasonable foundation" within the meaning of section 107(2) *supra.* Likewise, we conclude that the debtor is not entitled to attorney's fees under the No-Fault Act since we find that Hanover's denial of the debtor's claims for no-fault benefits was not only reasonable under the facts of this case but also legally justifiable under Pennsylvania law and the provisions of the No-Fault Act. *See Hayes v. Erie Insurance Exchange,* 493 Pa. 150, 425 A.2d 419 (1981); 40 P.S. § 1009.107(3).

---

**8.** $976.00 (monthly maximum)  $11,712.00 (annual maximum)
   x  12 (months in a year)      − 52 (weeks in a year)
$11,712.00                  $  225.23 (weekly maximum)

