381 A.2d 459

Carolyn Sue ALBERT et al.

v.

John Keith ALTER, M. Roy Alter, Ronald E. Shaffer, Jr.
and Ronald Earl Shaffer.

Anita Louise GALLO et al.

v.

John Keith ALTER, M. Roy Alter, Ronald E. Shaffer, Jr.
and Ronald Earl Shaffer.

Cynthia D. SOLOMON et al.

v.

John Keith ALTER, M. Roy Alter, Ronald E. Shaffer, Jr.
and Ronald Earl Shaffer.

Martha Jay CALDWELL et al.

v.

John Keith ALTER, M. Roy Alter, Ronald E. Shaffer, Jr.
and Ronald Earl Shaffer.

Appeal of John Keith ALTER and M. Roy Alter (All Actions).

Superior Court of Pennsylvania.

Argued April 13, 1977.

Decided Dec. 2, 1977.

204

206

Avra N. Pershing, Jr., Greensburg, for appellants.

Joseph E. Breman, Irwin B. Wedner, and James A. Beinkemper, Sr., Pittsburgh, for appellees at Nos. 197, 198, and 199.

Joel A. Claster and J. Raymond Ambrose, Jr., New Kensington, for appellee at No. 200.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE and SPAETH, JJ.

HOFFMAN, Judge:

Appellants contend that the trial court erred (1) in refusing to grant a new trial because the verdict was against the weight of the evidence; (2) in permitting appellee to ask prejudicial questions concerning the absence of reflectors and lights and in charging the jury erroneously on their absence; (3) in using the term legal cause in its charge; and (4) in refusing to grant a new trial because the verdicts were

excessive. We agree with appellants' final contention with respect to one appellee, and, therefore, we reverse and remand for a new trial limited to the issue of damages for one appellee.

On October 28, 1972, at approximately 8 p. m., the four minor plaintiffs [1] met at the M. Roy Alter farm to participate in a hayride organized by the youth group of the Calvary United Presbyterian Church in Leechburg, Westmoreland County. The group consisted of approximately 17 young people and two adult chaperones. At about 8:30 p. m., the Calvary Church departed on its hayride. The young people were seated on the tractor drawn haywagon with their legs dangling over both the road and the berm sides. After a few miles, the tractor turned onto Garver's Ferry Road, a two lane, asphalt road in a semi-rural area. A few moments later a car, driven by Ronald E. Shaffer, Jr., approached the haywagon from the opposite direction. The Shaffer vehicle collided with the left front of the haywagon and the four plaintiffs herein suffered injuries as a result of the collision.

At trial, a number of witnesses testified and conflicting accounts of the accident evolved. The plaintiffs introduced into evidence several photographs taken at the scene of the accident on the night it occurred. The first police officer to arrive at the scene testified that both vehicles were damaged in the left front. He stated that he measured the width of the road bed at the scene and that it was 16 feet wide. He measured the width of the wagon and found it to be 8 feet. He also stated that, based upon his own observations, he concluded that the wagon was wider than the tractor. The wagon had two red lights and a reflector at the rear but had no other reflectors or lights. The officer's notes indicated that he received a radio call about the accident at about 9:35, that the weather was clear, dry and that the sky was dark. The officer was unable to ascertain the point of impact.

1. For convenience we shall refer to appellees Albert, Solomon, Caldwell, and Gallo as plaintiffs.

Each of the drivers testified to a different version of the events. Appellee Shaffer testified that he was travelling south on Garver's Ferry Road at about 9:30 p. m. As his car crested a hill, he observed the lights of an approaching vehicle. The vehicle was about 150 to 200 yards away when Shaffer first observed its lights. Because the lights were so close together, he assumed that it was a small sports car. Shaffer stated that the road was dry, narrow, and had some potholes. He stated unequivocally that he drove on the right hand side of the road at all times. However, the tractor lights glared in his eyes momentarily and he did not see the haywagon until after the accident occurred. He testified that he was travelling at 30–35 m. p. h. in an unposted area and that his car was under control at all times.

Appellant John Keith Alter testified that he was travelling north on Garver's Ferry Road on the night in question. He endeavored at all times to maintain the tractor and wagon on the right side of the road. From the time that Alter first saw Shaffer's car, about 500 feet away, he drove the wagon so that it was on its own side of the road. The tractor was proceeding at 6 m. p. h.; Alter stated that the Shaffer car was coming "fast". When the car was approximately 100 feet away, Alter noticed that it had crossed the center of the road and was approaching the tractor and wagon. He tried to move his vehicles further to the right but was unable to go too far because of some mailboxes about 3 feet from the roadway. He further stated that he waved a light over the left wheel of the tractor to draw attention to the width of the vehicle. At the time of the impact his vehicle was near a street light and almost half of the rig was off the road.

The owner of the tractor and wagon, M. Roy Alter, testified that he and his family had been conducting hayrides for approximately 20 years. He stated that the wagon was 8 feet wide and 17½ feet long. The tractor was 18 inches wide in the front and 7 feet 4 inches wide at the rear wheels. The tractor was equipped with two tractor lights

located on a bar on the steering wheel column. The lights were approximately three feet apart and were directed so that they illuminated the road for about 30 feet ahead. Mr. Alter stated that the only lights or reflectors on the trailer were at the rear where two red lights and a reflector were located.

Two of the minor plaintiffs and the two chaperones testified. None saw the approaching Shaffer car because they were not facing oncoming traffic. Wayne Szajna, whose home is situated on Garver's Ferry Road, testified that on the night of the accident he was driving his car in the same direction as the haywagon on Garver's Ferry Road. Mr. Szajna testified that the haywagon was in the center of the road and; in order to pass it, he was forced to leave the left lane and travel partially on the left berm. The accident occurred a few moments after Mr. Szajna reached his home which is one half mile from the point at which he passed the wagon.

John L. Sacks, a professional legal photographer, testified for the defendants that on May 25, 1975, two and one-half years after the accident, he measured the roadway at the scene of the accident. The roadway was 17 feet 4 inches wide.

At the conclusion of the testimony concerning liability, the plaintiffs introduced medical testimony to prove the amount of the damages. The treating physician, each plaintiff, and one parent testified with respect to the extent of the injuries suffered.

The jury returned the following verdict:

"Ladies and gentleman of the Jury, harken to your verdict: Was Ronald Shaffer negligent in the operation of the automobile and was that negligence a legal cause of the accident and injuries? Answer: No. Was John Keith Alter negligent and was that negligence a legal cause of the accident and injuries? Answer: Yes. Was M. Roy Alter Negligent and was that negligence a legal cause of the accident and injuries? Answer: Yes. Was Ronald Shaffer,

M. Roy Alter, and John Keith Alter concurrently negligent and was that concurrent negligence a legal cause of the accident and injuries? Answer: No."

The amounts awarded, as molded by the court to reflect the expenses of the parents, were as follows:

| Martha Caldwell: | expenses | $ 884.50 |
| | remainder | $10,000.00 |
| | Total | $10,884.50 |
| Carolyn Albert: | expenses | $ 2,021.43 |
| | remainder | $35,000.00 |
| | Total | $37,021.43 |
| Cynthia Solomon: | expenses | $ 2,626.43 |
| | remainder | $25,000.00 |
| | Total | $27,626.43 |
| Anita Gallo: | expenses | $ 4,779.29 |
| | remainder | $100,000.00 |
| | Total | $104,779.29 |

Appellants filed motions for a new trial. After oral argument, the court en banc denied these motions. This appeal followed.

 Appellants first contend that the lower court abused its discretion in failing to grant a new trial because the verdicts were against the weight of the evidence. Specifically, appellants contend that the jury and lower court improperly ignored evidence of Shaffer's negligence. The law in Pennsylvania is well-settled, that " '[t]he grant of a new trial is within the sound discretion of the trial judge, who is present at the offering of all relevant testimony, but that discretion is not absolute; this Court will review the action of the court below and will reverse if it determines that it acted capriciously or palpably abused its discretion.' *Austin v. Ridge*, 435 Pa. 1, 4, 255 A.2d 123, 124 (1969), and cases there cited. 'A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion: [citation omitted]. Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party.' *Carroll v.*

*Pittsburgh*, 368 Pa. 436, 445–446, 84 A.2d 505, 509 (1951). A new trial should be awarded on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Jones v. Williams*, 358 Pa. 559, 564, 58 A.2d 57; *Carroll v. Pittsburgh*, supra, 368 Pa. at 447, 84 A.2d 505; *Brown v. McLean Trucking Co.*, 434 Pa. 427, 429–430, 256 A.2d 606 (1969)." *Burrell v. Phila. Elect. Co.*, 438 Pa. 286, 288, 289, 265 A.2d 516, 517 (1970); *Brown v. McLean Trucking Co.*, 434 Pa. 427, 256 A.2d 606 (1969); *Dixon v. Andrew Tile and Manufacturing Corp.*, 238 Pa.Super. 275, 357 A.2d 667 (1976).

█ Our review of the record in the instant case convinces us that the conflicting evidence offered is sufficient to support a verdict against appellants. Appellants selectively review the record and point out: several witnesses testified that the haywagon maintained its own side of the road; the accident occurred near a street light; Schaffer had on his low beams and did not see the haywagon; and Shaffer did not reduce his speed even though the tractor lights glared in his eyes. Based upon these and other facts, appellants contend that Shaffer was negligent and that a new trial must be granted. However, appellants have ignored the testimony which supports the verdict. The witnesses testified that at times, appellant travelled in the center of the road; the wagon bed was 8 feet wide and the road, as measured by the police, was only 16 feet wide; the tractor lights were so close together that they gave the impression that a small car was approaching; Shaffer had his car under control at 30–35 m. p. h.; the wagon had no side or front lights; and the tractor lights momentarily glared in Shaffer's eyes. A determination of liability in the instant case necessarily involved the jury's resolution of issues of credibility of the witnesses. The court and jury had the opportunity to observe the demeanor of the witnesses. The jury reviewed the conflicting testimony and returned a verdict only against appellants. We will not grant a new trial on

the ground that the verdict is against the weight of the evidence when the evidence is conflicting and the jury could have decided in favor of either party. *Hilliard v. Anderson*, 440 Pa. 625, 271 A.2d 227 (1970). Therefore, we find that the lower court did not abuse its discretion in refusing to grant a new trial.

Appellants next contend that the repeated mention of the absence of reflectors and lights on the haywagon was prejudicial. At trial the plaintiffs' attorneys questioned almost all of the witnesses about the presence and location of lights on the haywagon. The lower court overruled appellants' objection to this evidence. The introduction of relevant testimony is controlled by the trial court and will not be reversed on appeal unless there is an abuse of discretion. See *Piso v. Weirton Steel*, 235 Pa.Super. 517, 345 A.2d 728 (1975). As stated in *Thompson v. American Steel & Wire Co.*, 317 Pa. 7, 11, 175 A.2d 541 (1934): "[The trial court] is constantly faced with questions on evidence in their special relation to the issue to be tried. He must deal with such questions in the light of the purposes of the ultimate inquiry and does so in the exercise of what is known as judicial discretion . . . His conclusion or decision on such points will not be interfered with on appeal save for manifest abuse of power." *Levinson v. Commonwealth*, 395 Pa. 613, 151 A.2d 453 (1959); *Commonwealth v. Honeycutt*, 227 Pa.Super. 265, 323 A.2d 775 (1974).

Whether the haywagon was equipped with reflectors and lights is clearly relevant to the issue of the Alters' and the Shaffers' negligence. The Alters' failure to equip the wagon with lights made it difficult to see the vehicle at night and may have excused Shaffer's failure to observe the wagon prior to impact. Thus, the nature of this lighting on the wagon was extremely probative on the issue of negligence. Further, we do not think that questioning several witnesses about the lights was sufficiently prejudical to require reversal. The evidence was not calculated to inflame the jury's emotions of prejudice, hostility, or sympa-

thy.[2] The decision to admit the relevant testimony was well within the discretion of the trial court and we find no abuse of that power.

 Appellants also contend that the court erroneously charged the jury on The Vehicle Code lighting requirements for the wagon.[3] Appellant initially alleges that The Vehicle Code definition of trailer specifically excludes the haywagon from the lighting requirements. The definition of trailer is as follows: "Every vehicle without motive power, designed to carry property or passengers or designed and used exclusively for living quarters wholly on its own structure, and to be drawn by a motor vehicle or tractor: Provided, That wagons, wagons equipped with trailer hitch and agricultural machinery drawn by motor vehicles or tractors for the transportation of the agricultural products of the owner of such wagons, wagons equipped with trailer hitch or machinery, or returning from such transportation, shall not be included within such definition, and no fees shall be required to operate such vehicles on the public highways." Act of Jan. 10, 1972, P.L. 665 (1971), No. 177, § 1, as amended, 75

2. "It should be emphasized that prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one. In the pungent phrase of Sloan, J., in *State v. Rollo*, 221 Or. 428, 438, 351 P.2d 422, 426 (1960), the party 'is entitled to hit as hard as he can above, but not below, the belt.' See, F.R.Ev. (R.D.1971) 403 and Note. Since this competition between proper and improper bases for decision is involved, it is natural that what one court calls 'unfair prejudice', another may refer to as 'confusion of issues,' or 'distraction of the jury from the issue it should determine.'" McCormick on Evidence, § 185 at 439, n. 31 (Second Ed. 1970).

3. The court charged the jury on the Vehicle Code lighting requirements for trailers by stating that such vehicles are required to have two rear reflectors and two side reflectors. It also instructed the jury that the Code requires the Alter vehicle to display two electric clearance lamps in the front visible for 500 feet. These lights must be mounted to indicate the extreme height and width of the vehicle. Trailers are also required to be equipped with four electric side marker lights visible from a distance of 500 yards. The court also charged the jury on the definition of a trailer and a farm tractor.

P.S. § 102. A careful scrutiny of the statute reveals that the exclusion applies only to farm vehicles which are, in fact, transporting agricultural products or are engaged in work incident to the operation of a farm. A vehicle without motive power which is designed to carry passengers falls within the code definition of a trailer. This view is supported by *Gagliano v. Ditzler*, 437 Pa. 230, 263 A.2d 319 (1970). In *Gagliano* a head-on collision occurred at night between a car and a tractor and haywagon loaded with young people on a hayride. In dicta the Court said: "It is undisputed that, although the tractor was equipped with headlights and the hay wagon had reflectors around its sides, the hay wagon did not have the 'electric clearance lamps' that are required by The Vehicle Code, [supra] . . . ." 437 Pa. at 231–232, 263 A.2d at 320. Thus, the Supreme Court clearly believed that the Motor Vehicle Act's lighting requirements for trailers applied to farm wagons when they were conducting a hayride.

In the instant case, because the vehicle in question was carrying children, not agricultural products, and because it was not performing any function incident to the operation of a farm, we find that the vehicle was a trailer as defined in The Vehicle Code. Therefore, the trial court properly instructed the jury on the lighting requirements for trailers.

■ Appellants also contend that the court erred in refusing to charge the jury on § 801(g) which reads as follows: "Every commercial motor vehicle, trailer, semi-trailer or every motor omnibus or motor bus, except motor buses or motor omnibuses operated entirely within municipalities when their interiors are illuminated, shall display lighted lamps at the times mentioned in subsection (a) when and as required in this section, except that such lamps may be, but are not required to be, lighted when any such vehicle is upon a highway which is sufficiently illuminated by street lamps to render any person or vehicle visible at a distance of five hundred (500) feet." This section of the statute exempts trailers from the use of such lights only when the street lights provide such good visibility that a person or vehicle

would be visible at a distance of 500 feet. In the instant case, the parties testified that they could see the lights of approaching vehicles at a distance of 500 feet; there is no testimony that persons or vehicles were visible at 500 feet. Further, the photographs admitted into evidence clearly demonstrate that the accident occurred in a semi-rural township. There is no evidence that the one small street lamp evident on the scene was able to illuminate the area so as to satisfy the requirements of The Vehicle Code's exception. We cannot presume from a silent record that the lights in the area were adequate. Therefore, the trial court properly refused an instruction.

Appellants argue that the use of the words legal cause in the lower court's charge instead of proximate cause was erroneous. They also allege that it was misleading and confusing due to the court's prior reference to the legal requirements of The Vehicle Code.[4]

Pennsylvania courts have frequently stated: "[a]s 'in all cases questioning the accuracy of a charge to the jury, we must not take the challenged words or passage out of the context of the whole charge, but must look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party'. *Whitner v. Lojeski*, 437 Pa. 448, 454, 263 A.2d 889, 892 (1970). *See also, Wilson v. Penna. R. R. Co.*, 421 Pa. 419, 219 A.2d 666 (1966); *Sherman v. Manufacturers Light and Heat Co.*, 389 Pa. 61, 132 A.2d 255 (1957)." *McCay v. Philadelphia Electric Co.*, 447 Pa. 490, 499, 291

---

4. In the court's charge on causation it used the words legal cause. However, it also explained to the jury that the actor's conduct must have been a substantial factor in bringing about the harm alleged. It stated, *inter alia*: "A substantial factor is an actual, real factor, although the result may be unusual or unexpected, but it is not an imaginary or fanciful factor or a factor having no connection or only an insignificant connection with the accident. Defendants' negligence, if it was negligence, must have been a substantial factor in bringing about the accident, the legal cause, a substantial factor is the actual, real factor, although the result may be unusual or unexpected, the legal cause of the accident, substantial factor."

A.2d 759, 763 (1972); *Delp v. Heath,* 234 Pa.Super. 607, 340 A.2d 530 (1975). The Restatement (Second) of Torts, § 431 provides as follows:

"The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bring about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." The Restatement approach has been specifically approved by Pennsylvania courts. In *Whitner v. Lojeski, supra,* 437 Pa. at 458, 263 A.2d at 894, the Supreme Court stated: "The Restatement approach to this subject is no stranger to Pennsylvania law. Sections 431 and 432 have been cited and relied upon many times by this Court. Although the definition of legal cause in § 431 differs in terminology from that found in the pre-Restatement Pennsylvania cases, it has been authoritatively stated not to differ in substance, as applied to specific factual situations. See Eldredge, Vol. II of Pennsylvania Annotations to the Restatement, §§ 431, 432 (1938). Without attributing infallibility to the Restatement, we would think it better, in the interest of consistency and hopefully of clarity, to utilize its approach to the problem of legal causation." (footnotes omitted) See also *Noon v. Knavel,* 234 Pa.Super. 198, 339 A.2d 545 (1975).

In the instant case the lower court followed the Restatement § 431 by using the words legal cause. It clearly charged the jury on the issue of cause by reiterating that the actor's conduct must have been a substantial factor in bringing about the harm alleged. There is no requirement that the court use the exact words "proximate cause", for that phrase holds no magic. The important consideration is that the explanation given by the trial court on the issue of causation be given in clear and understandable language. Moreover, viewing the charge as a whole, we do not find it to be misleading or confusing. The court did

instruct the jury on the lighting requirements of The Vehicle Code. It did not use the words "legal requirements" with respect to the lighting regulations for trailers. The court did not state or imply that the absence of the lights constituted negligent conduct, nor did it state or imply that the mere absence of the lights was a cause of the accident. Instead, after outlining the Vehicle Code requirements to the jury, the court gave a complete charge on what constitutes negligent conduct. It then charged that, even if there were negligent conduct, in order to find liability, that negligent conduct must have been a substantial factor in bringing about the accident. Therefore, we find that the court's charge, considered as a whole, was thorough, accurate, and clear.

Appellants next contend that the verdicts were excessive and that a new trial should be awarded. We first consider this contention with respect to plaintiffs Carolyn Albert, Cynthia Solomon, and Martha Caldwell.

Dr. Ferlan testified that he treated Martha Caldwell for the injuries that she received in the accident. He stated that she suffered lacerations, swelling and scratches on both ankles. X-rays revealed that the malleolus shaft of her left ankle was fractured. She was hospitalized for 12 days. After the lacerations healed, the doctor applied a cast to her left leg which she wore for approximately six weeks. He stated that Ms. Caldwell has now completely recovered. Counsel introduced the doctor and hospital bills into evidence. Both Ms. Caldwell and her mother testified about Martha's injuries, her inability to participate in school activities, and the care she required at home.

Doctor Brady testified that he assisted in an operation performed on Cynthia Solomon for injuries which she received in the hayride incident. Dr. Brady stated that Ms. Solomon suffered a comminuted compound fracture of the medial malleolus,[5] a torn major ligament, a severed major nerve, loss of the tip of the medial malleolus, and poor

5. Malleolus is the rounded lateral projection on each bone of the leg at the ankle.

circulation of the left leg. She also sustained a degloving injury [6] on the right foot. Dr. Brady assisted Dr. Schwartz in performing emergency surgery on Ms. Solomon. She was hospitalized for 12 days and subsequently wore a cast on her left leg and a splint on her right leg. Dr. Schwartz testified that Ms. Solomon's recovery was good, although the latest x-rays revealed degenerative arthritis of the ankle joint. His bills and those of the hospital were introduced. Ms. Solomon and her mother testified about the former's injuries and the resulting limitations on her activities.

Dr. Brady also testified that he treated Carolyn Albert for injuries which she received in the accident. He stated that she had a contused, extremely ragged, widely undermined, and grossly contaminated laceration of the dorso-lateral aspect of the right foot. She also had a laceration of the short muscles that originate in the forefoot which help to bring the toes upward. The tissues were hollowed out for 4 or 5 inches in both directions from the cut. She had bruises on the lower half of both legs. Several veins were lacerated and 5 or 6 centimeters of subcutaneous fatty tissue were completely stripped away. Dr. Brady performed surgery on Ms. Albert; she was hospitalized for six days. Subsequently, Dr. Brady realized that three separate portions of the undermined skin flaps had died because of the complete loss of their blood supply. Ms. Albert was readmitted to the hospital on December 13, 1972, for skin grafting. She remained for 10 days and her mobility was again limited. Counsel introduced both the doctor and the hospital bills. Ms. Albert, in addition to the scars on her feet and legs, has a visible deformity of the lower third of her leg which consists of a hollowed out area where the fatty tissue was stripped away. Carolyn Albert and her mother both testified about Carolyn's injuries and subsequently limited activities.

▮▮▮▮ Initially, we note that "[t]he granting or refusing of a motion for a new trial because of excessiveness is

---

6. A degloving injury is one in which the skin is peeled off of the underlying tissues for some distance.

peculiarly within the discretion of the trial court and will not be interfered with by this court unless the record discloses a clear abuse of discretion. *Hall v. George*, 403 Pa. 563, 170 A.2d 367 (1961). As we stated in *Kane v. Scranton Transit Co.*, 372 Pa. 496, 94 A.2d 560 (1953), we will not hold a verdict to be excessive unless it is . . . 'so grossly excessive as to shock our sense of justice.' " *Connolly v. Philadelphia Trans. Co.*, 420 Pa. 280, 287, 216 A.2d 60, 64 (1966); *Tonik v. Apex Garages Inc.*, 442 Pa. 373, 275 A.2d 296 (1971).

In the instant case, we do not believe that the court abused its discretion in refusing to grant a new trial for the three above-named plaintiffs on the basis of excessive verdicts. The three teenaged girls suffered severe injuries to their legs and feet as a result of the accident. Each of them spent time in the hospital and then had to stay at home to recover more fully. Each girl suffered pain and discomfort as a result of the accident. Their injuries prevented them from participating in school and school activities. Further, each girl received permanent scars which they exhibited to the jury. Based upon the evidence presented by Ms. Solomon, Ms. Caldwell, and Ms. Albert, we find that the verdicts are not so excessive as to shock the conscience of the court.

Finally, appellants contend that the verdict in favor of Anita Gallo is excessive and they request a new trial. More particularly, they contend that the medical testimony failed to prove that all of Ms. Gallo's injuries resulted from the hayride accident.

Dr. Vossoughi first treated Ms. Gallo on October 30, 1972, for injuries which she received in the accident. She had contusions on both legs and a fracture of the first metatarsal of her left foot. He treated the fracture by taping and bandaging the foot and providing her with crutches. Her fracture had healed by September 18, 1973. Ms. Gallo missed approximately one month of school. Sometime subsequent to the accident, she developed low back pain and consulted Dr. Donaldson, an orthopedic surgeon. He as-

certained that Ms. Gallo was suffering from double scoliosis [7] and spondylolisthesis.[8] Dr. Donaldson treated Ms. Gallo by prescribing a supportive low back belt and prohibiting excessive physical activity. By October 8, 1974, Ms. Gallo still had symptomatic spondylolisthesis and Dr. Donaldson decided to operate. On November 4, 1974, Dr. Donaldson performed a spinal fusion from the fourth lumbar vertebra across the fifth lumbar vertebra and onto the sacrum. This surgery required two incisions, because bone chips had to be taken from the pelvis to graft onto the vertebra. Ms. Gallo was hospitalized three weeks and could not return to school until February of 1975. The fusion was successful and, as a result, she had permanent limited motion in the lower back. Both Ms. Gallo and her mother testified about the extensive pain suffered by Anita, the debilitating effect of the operation, and the activities in which she could not participate. With respect to whether the back injury resulted from the hayride incident, plaintiff Gallo produced the following testimony:

"Q. Would it be fair to say both scoliosis and spondylolisthesis are developmental type things?

"A. The scoliosis is idiopathic because there are many other types of scoliosis that we know the cause or disease associated with them. In spondylolisthesis, we can—the closest we can come to it is that there is a definite inheritance pattern in many of the patients and probably one inherits the defect or tendency to develop it. . . .

"A. Scoliosis of this type, idiopathic scoliosis, nobody knows the cause. There are known types of curvature, but this is the pattern most commonly seen in adolescent girls as compared to other ages or the male sex.

"Q. You're telling us she has what you call idiopathic scoliosis or unknown cause?

"A. Yes. . . .

7. Scoliosis is an abnormal curvature of the spine.

8. Spondylolisthesis is a defect in one or more vertebrae.

"A. This condition [spondylolisthesis] has two associations which are important. One is that patients who have a curvature of the spine of the idiopathic type, which this patient has, have a higher percentage of spondylolisthesis in the low back than the routine population. Second, the presence of spondylolisthesis tends to occur in families. In other words, if we have a patient with spondylolisthesis, the chances of another member in the family having it are much higher than one would find in the ordinary family. For a long time this led us to believe that the defect is an inherited defect, but subsequent studies have shown this is not always true. So current thinking is that the defect or tendency to develop a defect is inheritant. . . .

"Q. In your expert medical opinion, can you tell us within the realm of reasonable medical certainty as to whether or not you have an opinion as to the cause of the pain which led to the operation which you've described?

BY MR. PERSHING: Proceed.

BY MR. BEINKEMPER: Proceed.

"Q. You can answer the question.

"A. The surgery was performed because she had symptomatic spondylolisthesis and had shown inadequate response to conservative treatment. . . .

"Q. One final question, Doctor. Based on reasonable medical certainty, Doctor, do you have an opinion as to the cause of Miss Gallo's low back pain.

"A. Miss Gallo's pain, based on her history, had its onset subsequent to the accident of October, 1972. Her pain was in the low back, in the area where the spondylolisthesis previously described exited. . . .

"Q. What about spondylolistheses?

"A. It may either be painful or non-painful.

"Q. Can it be painful regardless of any contributing factor in and of itself?

"A. A patient who has spondylolisthesis has some precipitating episode of varying degrees. That the reason they go

to see the doctor. Most of the patients who we see is not because it has been found, but because of some other test. There are a few patients who we see like that. I see so many patients with scoliosis, I routinely X-ray the low back regardless of symptoms and I find it."

Appellants contend that Ms. Gallo failed to establish a causal connection between the occurrence of the accident and her back pain and operation. Pennsylvania case law is clear that in a personal injury case when there is no obvious causal relationship between the accident and the injury, unequivocal medical testimony is necessary to establish the causal connection. *Smith v. German*, 434 Pa. 47, 253 A.2d 107 (1969); *Florig v. Sears, Roebuck & Co.*, 388 Pa. 419, 130 A.2d 445 (1957); *Washko v. Ruckno, Inc.*, 180 Pa.Super. 606, 121 A.2d 456 (1956); *Rich v. Philadelphia Abattoir Co.*, 160 Pa.Super. 200, 50 A.2d 534 (1947). In *Washko* medical testimony was required to establish a causal connection between alleged overexertion and death from a heart attack. Similarly, medical testimony was held necessary when plaintiff contended that pneumonia resulted from a cut in his arm two months previously. *Anderson v. Baxter*, 285 Pa. 443, 132 A. 358 (1926). Expert testimony is not required when the injury is so immediately and directly, or naturally and probably, the result of the accident that the connection between them does not depend solely on the testimony of expert witness. *Tabuteau v. London G. & A. Co., Ltd.*, 351 Pa. 183, 40 A.2d 396 (1945). In the instant case, Ms. Gallo's back problems were not immediately and directly a result of the accident. Moreover, it is not apparent that there is an obvious causal connection between the accident and the back injury; therefore, medical testimony was necessary to establish the causal connection between the accident and the injury.

"In *McCrosson v. Philadelphia Rapid Transit Co.*, 283 Pa. 492, 495–496, 129 A. 568, 569 (1925), our Supreme Court set forth a legal test concerning the sufficiency for causation testimony by expert witnesses which 'required the expert to testify . . . that, in his "professional opinion,

the result in question [did] come from the cause alleged. . . ." ' Numerous cases since *McCrosson* have established that the expert witness must assert that the result in question actually came from the cause alleged. It is not enough to say that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." *Niggel v. Sears, Roebuck & Co.*, 219 Pa.Super. 353, 354, 355, 281 A.2d 718, 719 (1971); *Menarde v. Philadelphia Trans. Co.*, 376 Pa. 497, 103 A.2d 681 (1954); *Vorbnoff v. Mesta Machine Co.*, 286 Pa. 199, 133 A. 256 (1926); *Moyer v. Ford Motor Co.*, 205 Pa.Super. 384, 209 A.2d 43 (1965). Moreover, "[a] less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence (citing cases).

"The issue is not merely one of semantics. There is a logical reason for the rule. The opinion of a medical expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion. For a fact finder to award damages for a particular condition to a plaintiff, it must find as a fact that that condition was legally caused by the defendant's conduct." *McMahon v. Young*, 442 Pa. 484, 486, 276 A.2d 534, 535 (1971). A jury cannot be permitted to speculate on the issue of causation; there must be evidence on the record which satisfies the standard of certainty outlined above.

In applying that standard to the case at bar, we conclude that the expert testimony by Dr. Donaldson failed to meet the established requirements to prove causation. Nowhere in his testimony did the doctor state that, in his expert opinion, the back pain and spondylolisthesis resulted from the trauma of the accident. In response to questions about the cause of the pain suffered by Ms. Gallo, the doctor stated that the pain developed subsequent to the accident of October, 1972. He does not establish a causal link between the accident and the spondylolisthesis. He later states that most patients who have spondylolisthesis experience a precipitating episode which necessitates a visit to the doctor at

which time the defect is discovered. Dr. Donaldson did not testify that the accident suffered by Ms. Gallo was the precipitating factor in her case which caused her to develop symptomatic spondylolisthesis.[9] Because Ms. Gallo has failed to establish the requisite causal link between the accident and the injury to her back, we must reverse and remand. Appellants contend that we should grant them a new trial generally. However, we must consider their contention in light of case law which permits the granting of a new trial limited to the issue of damages.

" 'The granting of a new trial limited to the issue of damages was not permitted under the common law. . . However, in the interest of justice and in order to expedite the final disposition of litigation, Pennsylvania and most other jurisdictions have wisely adopted a rule permitting such limited new trials under certain specific circumstances.' *Troncatti v. Smereczniak*, 428 Pa. 7, 9, 235 A.2d 345, 346 (1967). The test set forth in *Troncatti* was two-fold: (1) the issue of liability must have been fairly determined; and (2) the question of damages must be readily separable from the issue of liability. In *Troncatti*, the award of a limited new trial was affirmed because the liability issue had been fairly determined, i. e., there were no trial errors, and the issues were separable. *Cf. Rosen v. Slough*, 212 Pa.Super. 398, 242 A.2d 898 (1968). This test was reaffirmed in *Gagliano v. Ditzler*, 437 Pa. 230, 232–233, 263 A.2d 319, 320 (1970): '. . . a lower court may grant a new trial, limited to the issue of damages, *only* where (1) the question of liability is not intertwined with the question of damages, *and* (2) the

---

**9.** Ms. Gallo could have recovered even if she had a pre-existing condition if she proved, through expert testimony, that the aggravation of that condition was caused by the accident. See *Heck v. Beryllium Corp.*, 424 Pa. 140, 226 A.2d 87 (1966); *Boushell v. Beers, Inc.*, 215 Pa.Super. 439, 258 A.2d 682 (1969). The Restatement (Second) of Torts, § 461 (1965) provides: "The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct."

issue of liability is either (a) not contested or (b) has been fairly determined so that no substantial complaint can be made with respect thereto.' *See also Bacsick v. Barnes*, 234 Pa.Super. 616, 625, 341 A.2d 157 (1975)." *Lininger v. Kromer*, 238 Pa.Super. 259, 272, 273, 358 A.2d 89, 96 (1976). Another factor for our Court to consider is whether or not the jury reached a compromise verdict. *Holmes v. Waters*, 235 Pa.Super. 180, 340 A.2d 474 (1975).

In the instant case, the issues of liability and damages are readily separable. In fact, the plaintiffs essentially conducted a bifurcated trial by first presenting all of their evidence relating to the night of the accident. At the conclusion of that testimony, they presented their evidence on damages and recalled two of the plaintiffs to testify only on damages. This is the type of accident case in which a jury could easily make an initial decision about liability and then proceed to compute damages. Additionally, because there were no trial errors, see *Lininger v. Kromer,* supra, the issue of liability has been fairly determined. Therefore, we find that the test set forth in *Troncatti* has been satisfied and we reverse and remand for a new trial limited to the damages of Ms. Gallo.

In the cases of *Carolyn Albert v. Alter; Martha Caldwell v. Alter;* and *Cynthia Solomon v. Alter,* the jury verdicts are affirmed. In the case of *Anita Gallo v. Alter,* we reverse and remand for a limited new trial.

CERCONE, J., files a concurring opinion.

VAN der VOORT, J., did not participate in the consideration or decision of this case.

CERCONE, Judge, concurring:

I join in the majority opinion because, in my estimation, the expert medical testimony in this case fell far short of that provided in *Hamil v. Bashline*, 243 Pa.Super. 227, 364 A.2d 1366 (1976).