433 A.2d 878

Carl CARNICELLI, Appellant,

v.

William J. BARTRAM, Jr., and Marjorie B. Bartram, his wife.

Superior Court of Pennsylvania.

Argued Nov. 12, 1980.

Filed June 12, 1981.

Reargument Denied Aug. 31, 1981.

---

Dina G. McIntyre, Pittsburgh, for appellant.

Edward L. Kochuba, Pittsburgh, for appellees.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This appeal is from an order granting a new trial. We reverse because the lower court relied on reasons not specifically assigned in the motion for new trial, and remand so that the court may consider those reasons that were specifically assigned.

–1–

■ An order granting or refusing to grant a new trial is within the discretion of the lower court. However, the discretion is not absolute, *Decker v. Kulesza*, 369 Pa. 259, 85 A.2d 413 (1952); *Albert v. Alter*, 252 Pa.Super. 203, 381 A.2d

459 (1977), and if the order is based on an error of law or represents an abuse of discretion, we will reverse. *Hand-finger v. Philadelphia Gas Works,* 439 Pa. 130, 266 A.2d 769 (1970); *Weaver v. Firestone Tire & Rubber Co.,* 367 Pa.Super. 548, 407 A.2d 45 (1979); *Sindler v. Goldman,* 256 Pa.Super. 417, 389 A.2d 1192 (1978). In reviewing the order, we examine all of the evidence presented at trial. *Hayter v. Sileo,* 230 Pa.Super. 329, 326 A.2d 462 (1974).

Appellant is an architect and engineer. He brought the present action to recover fees for architectural and engineering services rendered to appellee pursuant to a series of oral contracts.[1] Appellee counterclaimed for amounts loaned or advanced to appellant. The jury returned verdicts of $155,-000 for appellant and $6,900 for appellee. On appellee's motion, the lower court granted a new trial as to both appellant's claim and appellee's counterclaim.

In its opinion in support of the order granting a new trial, the lower court held that the verdict was "contrary to law" and "contrary to the evidence." The court held the verdict contrary to law because with respect to the performance of one of the agreements between the parties the court found that "[t]he probata . . . did not conform with the allegata as set forth in his complaint." Slip op. at 14. The court held the verdict contrary to the evidence for two reasons. First, the court said, appellant's "theory at the time of trial," that is, his theory as shown by his testimony, was inconsistent with the theory of his complaint. *Id.* at 14–15. Second, the court said, "the verdict of the jury was in conflict with [appellant's] evidence." *Id.* at 16.

Later in this opinion we shall consider the merits of these rulings. First, however, we must consider a procedural issue, which is of considerable importance. This issue arises because nowhere in his motion for the new trial did appellee assign as error either that, on the issue relied on by the lower court, the probata did not conform with the allegata

---

1. Appellee's wife, Marjorie B. Bartram, was also named as a defendant. At the close of appellant's case she was dismissed by agreement of the parties, R.R. at 392a–93a, and is not part of this appeal.

or that appellant's theory as shown by his testimony was inconsistent with the theory of his complaint, or that the verdict was in conflict with the evidence. Appellee did open his motion for new trial with three "boiler-plate" assignments: that the verdict was "against the evidence," "against the weight of the evidence," and "against the law." R.R. at 15a. He followed these with thirteen specific assignments. However, the lower court discussed none of these thirteen in its opinion. The issue we must decide, therefore, is this: When a party makes only boilerplate assignments of error, may the court *sua sponte* consider, as though within those assignments, specific assignments of error that might have been but were not made?

Some cases have held that because a trial court has the power to grant a new trial *sua sponte*, it is not error to grant a new trial for a reason not assigned in the motion for new trial. *E. g., Getz v. Balliet*, 431 Pa. 441, 446, 246 A.2d 108, 110 (1968). However, these cases preceded *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974). The Supreme Court has very recently considered the impact of *Dilliplaine* on the *Getz* line of cases. In *Tagnani v. Lew*, 493 Pa. 371, 426 A.2d 595 (1981), the Court held that it was error for a court *en banc* to grant a new trial when at trial an objection had been made and sustained and no further relief, such as a cautionary instruction or the withdrawal of a juror, had been requested.

It is not clear from the opinion in *Tagnani* just how specifically the error for which the court *en banc* granted a new trial had been assigned in the motion for new trial. The Court held that because relief could have been requested during trial but was not, the issue was waived. Thus it did not matter how general or how specific the assignment of error in the motion for new trial had been. However, in this case it does matter, because in granting a new trial the lower court relied on a reason that could not have been raised during trial—what it saw to be a conflict between the verdict and the evidence. Accordingly, we must consider the degree of specificity required in post-verdict motions in a

civil case, and we must do so in the light of the Supreme Court's opinion in *Tagnani.*

In *Tagnani* the Supreme Court acknowledged the broad discretion that trial courts have traditionally enjoyed in deciding whether to grant a new trial, but it held nonetheless that in keeping with *Dilliplaine* the exercise of this discretion must be limited to issues properly before the court. 493 Pa. at 376, 426 A.2d at 597. This holding at least implies that for an issue to be properly before the court, it must have been specifically assigned.

The Supreme Court has already said that this is true for criminal cases. "Boiler-plate" motions, such as "the verdict was against the law" or "against the evidence," are not sufficient because "counsel's precise statement of issues and grounds relied upon in written form [is necessary to] insure[ ] that both the trial court and the Commonwealth will have adequate notice of the legal theories being advanced." *Commonwealth v. Waters,* 477 Pa. 430, 434, 384 A.2d 234, 236 (1978). *See also Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975).

■ We believe that *Tagnani* requires that the same disapproval of "boiler-plate" motions be extended to civil cases. To permit the trial court to grant a new trial on the basis of a very general assignment of error, such as "the verdict is against the law" or "against the evidence," would result in losing the advantages of requiring specific assignments of error. Furthermore, to permit the trial court to make its own selection of reasons for granting a new trial, and then allocate those reasons under the rubric that the verdict was "against the law" or "against the evidence," would permit the court to grant a new trial for a reason that counsel would have been prevented from raising in the motion for new trial because at the time the alleged error occurred, no objection was made. Such a result would clearly be contrary to the mandate of *Tagnani.*

■ Applying the rule we have just stated to the present case, we hold that it was an abuse of discretion for the lower

court to grant a new trial. The court should have ignored appellee's general assignments of error, that the verdict was "against the law" and "against the evidence," and should have decided whether to grant a new trial only on the basis of its opinion of the merits of appellee's specific assignments.

–2–

We regard the rule we have just stated as being necessarily implied in *Dilliplaine*. The Supreme Court's opinion in *Tagnani* confirms this belief. However, we recognize that in making the rule explicit, our statement may seem new. Accordingly, we shall consider the merits of the lower court's rulings, as though they had been in response to objections made at trial and preserved by specific assignments of error in the motion for new trial and by subsequent oral argument.

Appellant and appellee began their business relationship in December 1963 when they were introduced by a mutual acquaintance, one Chris Heckman. Although the parties never entered into any written agreements, they did enter into a series of oral agreements. Pursuant to these agreements, over the next eight years appellant prepared plans for projects in which appellee was interested. Appellant's complaint alleged a separate oral agreement for each project. These projects included construction of a motel (the Saw Mill Run Boulevard project), a high-rise apartment building (the Brownsville Road project), the conversion of a riverboat into a floating restaurant and cocktail lounge (the Riverboat project), and several projects for the use of a site on Castle Shannon Boulevard, which already contained one building. For a variety of reasons, which included problems with zoning and financing, none of these projects was ever built.

Although appellant never asked for or received payment under the terms of these agreements until toward the end of the eight year period, he did receive from appellee at various times and in various forms some $43,000. Appellant testi-

fied that he understood these payments to be advances on his fees. In most of the projects, he said, the final amount of the fee would be determined when the project was built, because the fee was based on the cost of construction; if the project was not built, his fee would be based on the estimated cost of construction.

Appellant also testified to the making of each agreement and its terms, produced various drawings, plans, and sketches, and, for those agreements where it was relevant, explained how he had calculated the estimated cost of construction. Chris Heckman had been involved in some of the projects, and as to those he testified in support of appellant's version.

Appellee did not deny that he had had dealings with appellant on each of the projects. He did dispute the terms of the agreements, and he claimed that on two of the projects he had been acting as a disclosed agent for two corporations. It is plain from the verdict, however, that the jury rejected appellee's testimony when it conflicted with appellant's.

The first reason the lower court gave for granting a new trial was that "[t]he probata . . . did not conform with the allegata as set forth in [the] complaint." Slip op. at 14. This statement was made with reference to performance of the Riverboat project.[2]

The relevant paragraphs of appellant's complaint read: 18. On or about the 15th of December, 1967, Defendant William J. Bartram, Jr., orally hired the Plaintiff to prepare drawings or renderings, sketches, plans and specifications for the conversion of the riverboat into a floating restaurant and nightclub at an estimated cost of $100,-000.00.

2. Although appellee did not object either at trial or in his motion for new trial that the probata of the performance of the Riverboat agreement did not conform to the allegata, he did object at trial that the probata of the setting of the price for that agreement did not conform to the allegata. This objection was the subject of one of the specific assignments in the motion for new trial that the lower court did not discuss.

20. The Plaintiff, pursuant to the oral contract for hire to convert the said riverboat, prepared the said sketches, drawings, plans and specifications which were approved, accepted and used by the Defendant William J. Bartram, Jr.

The lower court summarized its view of appellant's proof of these allegations as follows:

The facts as testified to by Carnicelli at the trial were to the effect that he made one drawing which appeared to be an overlay tracing of one page of the boat's original construction plans, that he examined the original plans for the construction of the boat and that he went to the site of the boat. Nowhere in his testimony did Carnicelli testify that he prepared the sketches, drawings, plans and specifications which were necessary to convert the boat into a floating restaurant and nightclub or [*sic*; nor?] did he testify that even the single overlay drawing was approved, accepted and used by Bartram as plead[ed] in his complaint.

Slip op. at 13–14.

■ We find ourselves unable to accept this statement of the testimony. It fails to acknowledge appellant's unqualified assertion that his phase of the project was complete, and that work on the conversion had begun, when appellee abandoned the project. R.R. at 80a. It also fails to acknowledge appellant's testimony that because the project was for the conversion of an existing steel structure it did not require the same type of drawings as would new construction. Appellant testified that he had spent considerable time visiting the boat and marking the changes necessary for the conversion on a set of plans which had been supplied to him. These plans, identified as appellant's (plaintiff's) exhibit 16, were present at trial. R.R. at 78a, 258a–61a, 280a–83a. Although appellant referred to them in his testimony and they were offered into evidence, the lower court refused to receive them. R.R. at 387a–88a. Thus, when all of appellant's testimony is considered, there was no variation between the allegata and probata. Appel-

lee controverted appellant's account of the Riverboat project, but it was for the jury, not the lower court, to decide, which version to believe.

The second reason the lower court gave for granting a new trial was that appellant's "theory at the time of trial" was inconsistent with the theory of his complaint. Slip op. at 14–15.

Toward the end of his direct testimony appellant was asked if he had ever had a meeting with appellee concerning payment of his fees. R.R. at 116a–17a. He replied that he had, and that at the time of that meeting he had at appellee's request presented a complete bill covering all work done up to that time. This bill, which was admitted as appellant's (plaintiff's) Exhibit 27, was divided in four parts, each part representing a particular project. The total amount of the bill for each project was divided into specific charges, as, for example, $1,600 for "Structural Analysis." R.R. at 391a. Appellant did not explain how these specific charges had been figured, or how they reflected the terms of his agreements with appellee, nor was he asked to do so on cross-examination. The lower court characterized the bill as a "request for payment on a quantum meruit for specific services rendered," and as such, inconsistent with "[t]he claim in the complaint . . . for payment for services as a result of a specific contract of employment." Slip op. at 15.

▪ Appellant argues that

[s]ince it never occurred to us that anyone would construe the statement of November 3, 1971, as a quantum meruit billing, and since no objection was raised on that basis, plaintiff did not take the time to explain how the cost allocation of each phase of each job was arrived at (such details not being a necessary part of our burden of proof).

Brief for Appellant at 40.

We agree with appellant that nothing either on the face of his bill or in the testimony indicated that the detailed amounts had been computed on a quantum meruit basis. The lower court's characterization of appellant's bill as a

"request for payment on a quantum meruit" basis was therefore unsupported by the record. The characterization was especially inappropriate in view of the fact that no objection had been made to the bill either during the trial or in the motion for new trial.

The third, and final, reason the lower court gave for granting a new trial was that "the verdict of the jury was in conflict with [appellant's] evidence." Slip op. at 16.

In his testimony appellant admitted having received from appellee at various times and in various forms some $43,000. Appellant's complaint made no mention of this. Appellee's answer pleaded the various payments as a set-off and counterclaim, and appellant's reply for the most part admitted receipt of the payments but claimed that they were intended as advances against his fees and that he had signed the various notes and mortgages involved at appellee's request in order to provide memoranda of the transactions. At trial as part of his case-in-chief appellant testified to receiving the payments. R.R. at 120a–24a. He then attempted—unsuccessfully because of objections interposed by appellee—to explain what net credit he felt appellee was due after intervening transactions were taken into account. *Id.* at 125a–30a. However, later during the trial the amounts involved in these other transactions were by stipulation removed from the consideration of the jury. *See* R.R. at 647a–53a. This stipulation reduced the amount of the counterclaim, before interest, to $4,337.86. *Id.*

■ Appellant's testimony concerning the alleged advances was not a model of clarity, and certainly did not make him out to be astute in the conduct of his business. However, examining the testimony as a whole, as is our duty, *Hayter v. Sileo, supra,* we find nothing so incredible or contradictory that it was not properly the task of the jury to judge the credibility of the witnesses and to resolve conflicts in the testimony.

■ The lower court found that "although a jury verdict need not be equated with mathematical exactness," the

verdict did not bear a sufficiently close relationship to the evidence. Slip op. at 16. However, it appears that the court overlooked the stipulation reducing the amount of the counterclaim, for earlier in its opinion it wrote, "Although [appellant] admitted receiving these monies that were the basis of [appellee's] counterclaim in the sum of $43,763.74 (exclusive of interests) (T106), the jury returned a verdict for [appellee] only in the sum of $6,900.00." *Id.* at 12. As we have just noted, the amount of the counterclaim as submitted to the jury was, without interest, only $4,337.86—which with the addition of interest makes $6,900 an entirely reasonable amount.

The basis on which the jury arrived at its verdict for appellant in the amount of $155,000 is not as obvious. At trial appellant claimed that he was due, without regard to interest or set-off for the amounts advanced by appellee, $125,815. With interest, the total claimed was $173,138. Appellant testified and offered evidence regarding seven different contracts involving four separate projects. The jury was not asked for anything other than a lump-sum verdict.

In his brief appellant offers one explanation of how the jury might have arrived at the $155,000 figure. Brief for appellant at 46–48. He suggests that if the jury computed the interest only from March 1972, the date on which all of the projects were finally abandoned, and only on the amount of the fees less the full amount of the counterclaim, because it was only this amount of which appellant was deprived for the full period of time, interest at the legal rate of 6% would amount to $29,128.46 rather than the $47,323 he claimed. When $29,128.46 is added to the fees claimed $125,815, the total, $154,943.46, is extremely close to the verdict of $155,-000.

■ We have, of course, no way of knowing whether the jury computed its verdict in this manner or not. However, as the lower court acknowledged, exactness is not required. *See* 6 Standard Pennsylvania Practice 526. Here, the verdict was within eleven percent of the full amount claimed.

Quite a few projects were involved, and there was conflicting testimony as to how the fees were to be set. In the circumstances, the size of the difference between the amount claimed and the verdict is not large enough to overcome the presumption in favor of the verdict. *See e. g., Hornak v. Pittsburgh Railways Co.*, 433 Pa. 169, 175, 249 A.2d 312, 315 (1969) ("an inconsistency may justifiably be declared to exist only if there is no reasonable theory or conclusion to support the jury's verdict").

–3–

Although we have concluded that the lower court abused its discretion in granting a new trial for the reasons given in its opinion, we are unable to order that it reinstate the verdicts because of the court's failure to discuss any of the specific assignments of error in appellee's motion for new trial. We cannot tell from the court's opinion or from the record as transmitted to us whether these assignments were abandoned by appellee as a result of failure on his part to brief and argue them to the court, or were considered by the court and found to be without merit, or were not considered by the court because it had already decided to grant a new trial based on its own response to the boilerplate assignments of error. We shall therefore remand the case with the following instructions which will implement the rule we stated in the first part of this opinion and give effect to the Supreme Court's action in *Tagnani v. Lew, supra.* These instructions are modeled on the current procedures for post-verdict motions in criminal cases, which require that issues be preserved at each step of the review process so that the process may be as orderly and efficient as possible.

If the lower court has already considered the specific assignments of error in the motion for new trial and found them without merit, it shall file an opinion explaining why and reinstate the verdicts. However, if the court either has not considered those assignments, or has considered them favorably, the court should proceed as follows. If the court received a brief in support of the motion for a new trial, it

should consider only those assignments argued in the brief. If oral argument on the motion was held, it should consider only those assignments that were briefed and either argued or specifically reserved at argument. After the court considers those assignments of error that were properly preserved, it should file an opinion explaining its conclusions and either reinstate its order granting a new trial or reinstate the verdicts. Either party may then take a new appeal from the court's order.

Reversed and remanded for further proceedings consistent with this opinion.

WICKERSHAM, J., concurs in the result.